HOMECARE CRM, LLC, Plaintiff,

v.

The ADAM GROUP, INC. OF MIDDLE TENNESSEE, d/b/a PlayMaker CRM, Defendant.

Civil Action No. 1:12–cv–1958–TCB.

United States District Court, N.D. Georgia, Atlanta Division.

July 8, 2013.

Brian M. Clark, Craig L. Lowell, Wiggins Childs Quinn & Pantazis LLC, Birmingham, AL, Jason S. Alloy, Jeremy U. Littlefield, Richard Lance Robbins, Robbins Ross Alloy Belinfante Littlefield LLC, Atlanta, GA, Stephen Douglas Apolinsky, Apolinsky & Associates, LLC, Decatur, GA, for Plaintiff.

John Howard Fleming, Ann Grunewald Fort, Sutherland Asbill & Brennan, LLP, Atlanta, GA, Joshua R. Denton, Lucas R. Smith, Paige Waldrop Mills, Bass, Berry & Sims, PLC, Nashville, TN, for Defendant.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

Before the Court is the motion of Defendant The Adam Group, Inc. of Middle Tennessee ("PlayMaker") for sanctions against Plaintiff Homecare CRM, LLC [113] pursuant to Federal Rule of Civil Procedure 11.

As an initial matter, the Court notes that PlayMaker's motion limits its request for sanctions to Homecare. The motion does not seek sanctions against Homecare's counsel, who did not appear in the case until April 2013, almost a year after this action was filed.

### I. Background

Homecare and PlayMaker are competitors, and as this case has shown from the beginning, their dislike and distrust of each other runs deep. Both develop customer-relationship management software and license it to companies in the home care or hospice industry. Homecare and PlayMaker each have a core software product and an add-on program that allows customers to access even more information. Homecare's core product is "HomecareCRM," and its add-on software is called "Harvest." PlayMaker's core product is "PlayMaker CRM," and its add-on software is called "TargetWatch." The programs, among other things, allow the parties' respective customers to access and

filter medical claims data in order to find potential clients. The parties' current clash involves Harvest and TargetWatch.

Homecare developed Harvest in late 2010 and 2011 and marketed the program to its customers in early 2011. In April 2011, PlayMaker announced the availability of TargetWatch, which was available for customers to use the following month; TargetWatch performs functions similar to the functions that Harvest performs. E-mails sent from April through June 2011 show that Homecare knew about the launch of TargetWatch and about Play-Maker's partnership with Health Market Science ("HMS"), a company that sells Medicare claims data, to bring Target-Watch to PlayMaker's customers.

On June 6, 2012, Homecare filed this action. In its complaint, Homecare avers, among other things, that PlayMaker is wrongfully using its trademarks, has made false advertisements, has violated Georgia's Uniform Deceptive Trade Practices Act and Tennessee's Consumer Protection Act, has engaged in unfair competition, and has misappropriated Homecare's trade secrets. The latter allegation is the reason for the present motion.

Homecare avers that PlayMaker gained unauthorized access to and used Harvest, which is a trade secret, to create its competing product, TargetWatch. PlayMaker contends that not only is this untrue, but that Homecare and its former counsel violated Rule 11 by including the trade-secrets claim in the complaint.

The Court first summarizes Homecare's trade-secrets claim in the complaint and the factual allegations associated therewith as well as PlayMaker's arguments against the claim. Next, the Court reviews other disputes that have arisen in this case, as

they give important context for this motion. Finally, the Court evaluates whether Homecare violated Rule 11(b) such that sanctions are appropriate under Rule 11(c). Ultimately, the Court finds that Homecare did violate Rule 11(b) when its counsel signed a complaint that included the trade-secrets claim, and that sanctions are necessary.

## A. Homecare's Trade–Secrets Claim

In the second paragraph of its complaint, Homecare's opening salvo about PlayMaker's "wrongful activities" includes the allegation that PlayMaker "misappropriate[ed] significant portions of [Homecare's] proprietary software solutions, including the manner in which [Homecare's] software analyzes, compiles, presents and displays data on home health care referral sources, and using that information to design and develop competing software solutions."

Going into greater detail later in the complaint, Homecare avers that in 2010 it "came up with the idea to acquire raw Medicare and health insurance claims data" and to process that data so that its "health care industry customers [could] better identify and target local business referral sources." The product resulting from this idea was Harvest. Initially, Harvest offered Homecare's customers access to Medicare claims information; Homecare later added information from private health insurance companies to Harvest.

Homecare asserts that Harvest, "its underlying coding system, and the manner in which the information compilations are displayed and formatted in the Harvest solution ... are proprietary to [Homecare] and are confidential."[1] It contends that it

---

1. The Court uses "Harvest" as shorthand for what Homecare has identified as the confidential information associated with this product.

has made reasonable efforts "under the circumstances" to maintain the secrecy of Harvest, and consequently it constitutes a trade secret of Homecare.

Homecare avers that PlayMaker misappropriated Harvest. It contends that PlayMaker suspiciously marketed and offered TargetWatch soon after Homecare launched Harvest, and that TargetWatch "analyzes, compiles, formats, and displays information drawn from the claims data in manners that are very similar" to how Harvest operates. Homecare believes that TargetWatch is similar to Harvest because PlayMaker wrongfully obtained Homecare's proprietary data from HMS and wrongfully accessed Harvest.

With respect to Homecare's proprietary data with HMS, Homecare claims that it had an agreement with HMS to "format and compile data in a manner and format that was different from [HMS's] standard claims data set product, and that was proprietary to [Homecare] and to the analysis and compilations and formats and coding" that Homecare used for Harvest. Also, according to Homecare, its agreement with HMS provided that Homecare would "own all non-public data it provided to [HMS] for use in [HMS's] development, customization or use of technologies and processes to create deliverables for [Homecare], and all results provided by those deliverables." Homecare contends that PlayMaker knew about this relationship and used HMS to access Homecare's proprietary data.

With respect to accessing Harvest, Homecare alleges that PlayMaker "improperly and without authorization" obtained access to Harvest either through HMS or a Homecare current or former customer. Homecare avers that PlayMaker used the information it acquired from HMS and through its unauthorized access to Harvest to design, develop and modify its competing product, TargetWatch, and

that is why TargetWatch "analyzes, compiles, displays and presents very similar data in a substantially similar manner to" Harvest.

Thus, in the count for its claim for misappropriation of trade secrets, Homecare asserts that Harvest is comprised of trade secrets under Georgia's and Tennessee's trade-secrets statutes and that PlayMaker misappropriated Harvest when it

(a) acquired access to [Homecare's] Harvest Proprietary Data Solution by improper means; and/or (b) used [Homecare's] Harvest Proprietary Data Solution when it knew or had reason to know that knowledge of the Harvest Proprietary Data Solution was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was devised from or through a person who owed a duty to [Homecare] to maintain its secrecy or limit its use.

Homecare avers that PlayMaker improperly used Harvest to "design, develop and/or modify its competing TargetWatch data solution, and has utilized and continues to utilize this information for its own benefit and profit." Thus, Homecare concludes that PlayMaker misappropriated Harvest and willfully violated Georgia's and Tennessee's trade-secrets statutes.

PlayMaker vehemently disputes Homecare's version of events. PlayMaker contends that when the complaint was filed, Homecare and its counsel knew or should have known that the factual allegations in support of the trade-secrets claim were false, and that Homecare could not reasonably assert such a claim. Yet, PlayMaker argues, Homecare and its counsel included the claim and have refused to dismiss it despite strong evidence of its lack of merit. Thus, PlayMaker asserts that Homecare has violated Rule 11 and should be sanctioned. PlayMaker asks the Court to strike Homecare's claim for misappropria-

tion of trade secrets, to require Homecare to pay a monetary sanction, and to award PlayMaker's counsel fees and costs associated with bringing this motion.

As stated above, this dispute is just the latest disagreement between Homecare and PlayMaker in this case.

### B. Other Disagreements

PlayMaker filed with its original answer a counterclaim that averred claims for libel, slander, false advertising and unfair competition, violation of Georgia's Uniform Deceptive Trade Practices Act, tortious interference with business relations, and a declaratory judgment of non-infringement. The counterclaim was asserted against Homecare and two additional parties: Contactivation, a corporation affiliated with Homecare that supplies employees for Homecare's operations, and Daniel Christopher Tunnell, Homecare's senior vice president of sales.

The Counter–Defendants filed answers, and soon thereafter PlayMaker filed a motion to strike portions of those answers, contending that the answers contained accusations of "unethical and unsavory" conduct against PlayMaker's executives and accusations that PlayMaker's counsel had violated Rule 11. The Counter–Defendants then filed their own motion to strike, contending that certain allegations in PlayMaker's answer and counterclaim were "immaterial and impertinent," e.g., the allegations about Tunnell's criminal history.

Several months later, PlayMaker filed motions for leave to amend its counterclaim and for a temporary restraining order and preliminary injunction. In its motions, PlayMaker alleged that it had learned through discovery that Homecare and its employees had gained unauthorized access to PlayMaker CRM and Target-Watch from March 2012 through at least October 2012, and had used that access to gather confidential information about all aspects of PlayMaker's products. Play-Maker averred that Homecare used the information to (1) create a matrix that thoroughly compared Homecare's and PlayMaker's respective products, (2) improve its current products, and (3) launch new products, e.g., a mobile phone application.

As a result of this conduct, PlayMaker sought to amend its counterclaim by adding two additional Counter–Defendants: Annie Tunnell McDaniel, Homecare's vice president of support service and Tunnell's sister, and Keagan Brown, Homecare's vice president of product development. PlayMaker also sought to supplement its counterclaim with new factual allegations and to amend its counterclaim to add new claims for violations of the Computer Fraud and Abuse Act; the Stored Communications Act; the Electronic Communications Privacy Act; Alabama's, Delaware's, Georgia's, Tennessee's and Virginia's trade-secrets acts; Tennessee's personal and commercial computer act, consumer protection act, and wiretap act; and Alabama's trade practices act.

In its motion for injunctive relief, PlayMaker sought an order from the Court that would enjoin Homecare's (1) unauthorized access of PlayMaker's software and systems, and (2) misappropriation of the trade-secrets information learned through that access. On January 16, 2013, the Court held a hearing on PlayMaker's motions. That same day, the Court issued an order granting PlayMaker's motion to amend its counterclaim.

A few days later, on January 22, the Court issued an order that granted in part and denied in part PlayMaker's motion for injunctive relief. The order enjoined Homecare from (1) accessing Play-Maker's software and systems, (2) using

any information gained from its unauthorized access, and (3) spoliating any potentially responsive documents in this case. The order also provided for expedited discovery regarding Homecare's development of a mobile application for cellphones.

About a month after it filed its motion for sanctions, PlayMaker filed a motion to expand the preliminary injunction. It contends that the injunction must be expanded in order to, among other things, prevent Homecare from selling an updated version of HomecareCRM and other software products containing elements of the new HomecareCRM because Homecare used PlayMaker's trade-secrets in the update. PlayMaker also asks that the Court require Homecare to remove HomecareCRM from its customers' systems.

The same day PlayMaker filed the motion to expand the preliminary injunction, it also filed a motion for contempt against Homecare, Tunnell, Brown and McDaniel. PlayMaker contends that these Counter-Defendants lied to the Court in Homecare's opposition to PlayMaker's first motion for injunctive relief, and that they have since violated multiple provisions of the preliminary injunction by, e.g., continuing to use PlayMaker's trade secrets.

Interspersed with these motions were numerous discovery disputes that required the Court's involvement as well as motions for leave to file under seal dozens of documents, all of which required close review. The Court now turns to the merits of PlayMaker's motion for Rule 11 sanctions.

## II. Legal Standard

■ Exercising the power to issue sanctions is not something the Court takes lightly or does frequently. The purpose of Rule 11 sanctions is to "reduce frivolous claims, defenses, or motions, and to deter costly meritless maneuvers." *Massengale v. Ray*, 267 F.3d 1298, 1302 (11th Cir.

2001); *see also Noe v. Interstate Brands Corp.*, 188 F.R.D. 513, 515 (S.D.Ind.1999) (Rule 11's primary objective is to "give a litigant pause to stop, think, and investigate more carefully before filing papers, thereby streamlining the administration and procedure of the federal courts.") (internal quotations and citations omitted). Subsection (b) addresses what an attorney certifies to a court when he files a paper. It provides in relevant part:

> By presenting to the court a pleading, written motion, or other paper ... an attorney ... certifies that to the best of [his] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Although subsection (b) is limited to filings signed by an attorney or unrepresented party, the Court may nonetheless sanction a represented party for a subsection (b) violation. *See* FED.R.CIV.P. 11 advisory committee's note ("Even though it is the attorney whose signature violates the rule, it may be appropriate under the circumstances of the case to impose a sanction on the client."). Consequently, Rule 11(c) authorizes a court to impose appropriate sanctions on an attorney or party for Rule

11(b) violations. *See Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir.2001), *abrogated on other grounds recognized by Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir.2011); *Tucker v. U.S. Small Bus. Admin.*, No. 1:09–cv–2723–TWT, 2010 WL 925176, at *3 (N.D.Ga. Mar. 8, 2010).

## III. Analysis

PlayMaker contends that Homecare should be sanctioned because its claim for misappropriation of trade secrets has no evidentiary support and was made for an improper purpose. PlayMaker argues that appropriate sanctions are to strike the claim, impose a monetary sanction, and award PlayMaker its reasonable costs and fees incurred in pursuing this motion.

### A. Violation of Rule 11(b)

Rule 11 sanctions are warranted when a party files a pleading that "(1) has no reasonable factual basis; (2) is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; and (3) is filed in bad faith for an improper purpose." *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998). The "objective standard for testing conduct under Rule 11 is 'reasonableness under the circumstances' and 'what was reasonable to believe at the time' the pleading was submitted." *Baker*, 158 F.3d at 524; *accord Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1294 (11th Cir.2002); *Donaldson v. Clark*, 819 F.2d 1551, 1556 (11th Cir.1987).

The Eleventh Circuit employs a two-step inquiry when evaluating a Rule 11 motion, determining "(1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous." *Baker*, 158 F.3d at 524; *see also Rueter v. Merrill Lynch,*

*Pierce, Fenner & Smith, Inc.*, 440 F.Supp.2d 1256, 1266 (N.D.Ala.2006); *Isaac v. Am. Intercontinental Univ.*, No. 1:05–cv–2839–JEC, 2007 WL 1959201, at *3 (N.D.Ga. June 28, 2007). "Although sanctions are warranted when the claimant exhibits a 'deliberate indifference to obvious facts,' they are not warranted when the claimant's evidence is merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law." *Baker*, 158 F.3d at 524.

The Court finds that the factual allegations in support of Homecare's trade-secrets claim do not, and did not at the time this action was filed, have evidentiary support; thus, the trade-secrets claim is objectively frivolous. Moreover, the evidence showing the frivolousness of the claim comes from Homecare, so it and its counsel should have been aware that the claim was frivolous. Consequently, Homecare and its counsel violated subsection (b)(3) when its counsel signed the complaint, and sanctions are appropriate.

### 1. The Parties' Arguments

As stated above, Homecare accessed PlayMaker's software in March 2012, several months before it filed this action, and used its access to put together a matrix that compared the features of Homecar-eCRM and Harvest with the features of PlayMaker CRM and TargetWatch. The final matrix was completed on April 12, 2012 and contains a section that compares only Harvest and TargetWatch. At the end of this section, there is a paragraph entitled "Intellectual Property Concerns" which concludes that Homecare had "no intellectual property concerns" about TargetWatch. Understandably, PlayMaker is baffled that Homecare then alleged in its complaint two months later that Target-Watch suggests or shows that PlayMaker misappropriated Harvest.

Homecare responds that (1) the matrix was put together based on publicly available materials and materials available to any party seeking a PlayMaker product demonstration, and (2) its employees' access to PlayMaker's customer's account was authorized and did not provide access to TargetWatch. With respect to the first point, Homecare does not explain how this argument is relevant or how the fact that the matrix was compiled based on public information made it reasonable for Homecare's complaint to have a trade-secrets claim. Even if this argument were relevant, Homecare has not provided any evidence to support its contention that it used only publicly available materials to draft the matrix.

With respect to the second point, Homecare contends that because it did not have access to TargetWatch when the April 12 matrix was put together, Homecare could not have "already concluded that there were no 'intellectual property [concerns].'" Homecare relies on the declarations of Brown and McDaniel, both of whom accessed PlayMaker's system under the pretense of helping a PlayMaker customer determine whether it should switch to Homecare. Homecare's alleged lack of access to TargetWatch supposedly "put[s] to rest the notion that Homecare or its counsel proceeded in bad faith because their investigation into PlayMaker's Target-Watch feature revealed, before the filing of the lawsuit, that there were no intellectual

property concerns to TargetWatch and Harvest."

To begin with, the inquiry is not necessarily whether Homecare and its counsel "proceeded in bad faith," although a finding of bad faith can support Rule 11 sanctions. *See Baker*, 158 F.3d at 524 (Rule 11 sanctions are warranted when a party files a pleading that "is filed in bad faith for an improper purpose."). Rather, as provided above, the inquiry is what was reasonable under the circumstances and what was reasonable to believe at the time the pleading was submitted. To do this, the Court determines whether the trade-secrets claim was objectively frivolous and whether Homecare and its counsel should have been aware of the claim's frivolousness. This requires the Court to look at the elements of a trade-secrets claim.

### 2. Evaluating Homecare's Factual Allegations

■ To recover under Georgia's and Tennessee's trade-secrets statutes, Homecare must show that (1) it had a reasonable basis for believing Harvest is a trade secret, and (2) PlayMaker misappropriated Harvest, i.e., knowingly acquired, disclosed or used Harvest by improper means. *See Sutter Capital Mgmt., LLC v. Wells Capital, Inc.*, 310 Ga.App. 831, 714 S.E.2d 393, 394–95 (2011); *ProductiveMD, LLC v. 4UMD, LLC*, 821 F.Supp.2d 955, 962 (M.D.Tenn.2011). The major point of contention in the present motion is the second element,[2] specifically, whether Homecare

---

**2.** As to the first element—whether Harvest is a trade secret—Homecare contends that Harvest is a trade secret partly because Homecare had a proprietary arrangement of information with HMS. PlayMaker did not challenge this in its initial brief; however, in its reply brief, PlayMaker has produced evidence provided by HMS that suggests Homecare's information with HMS is not a trade secret. The evidence allegedly showing this is HMS and Homecare's licensing agreement and e-mails between the two entities discuss-

ing what Homecare purchased. The agreement and e-mails are from 2011, well before Homecare filed this action.

As this evidence was filed for the first time with PlayMaker's reply brief, Homecare could not address it in its opposition brief, and it did not seek leave to file a surreply brief. Nonetheless, the Court has reviewed the evidence and finds that it shows that Homecare likely did not have proprietary information with HMS that PlayMaker could have misap-

had evidentiary support for its factual allegations that PlayMaker misappropriated Harvest.

Homecare asserts that its trade-secrets claim is based on the following facts: (1) the similarity of the products; (2) the release of TargetWatch soon after Harvest was released; and (3) the opportunity for PlayMaker to discover Homecare's trade secrets through either HMS or a Homecare customer. The Court finds that Homecare knew or should known that the first and third allegations were directly contradicted by Homecare's own documents, and as a result, its factual allegations in support of its trade-secrets claim lacked evidentiary support in violation of Rule 11(b)(3).

### a. Similarity of Harvest and TargetWatch

With respect to the first factual basis for its trade-secrets claim, Homecare completely ignores that the April 2012 matrix compared the Harvest and TargetWatch features and concluded that the "Harvest solution is far superior to the TargetWatch system" and that "[m]any of the advances in Harvest over the last 18 months are not included." The matrix then lists seven items that presumably Harvest had but TargetWatch did not have at the time of review. So, in April 2012 TargetWatch lacked Harvest updates dating back to October 2010. Thus, Homecare's own comparison of the products showed that while Harvest and TargetWatch performed similar functions, they were quite different in their capabilities.

These differences make Homecare's argument that it could reasonably believe that PlayMaker misappropriated Harvest based on the products' similarities specious at best. The matrix directly refutes Homecare's contention that it was reasonable to include a trade-secrets claim that was based in part on the "similarity of the products." Yet, Homecare's opposition brief does not address how this comparison, which concluded that Harvest was "far superior" and TargetWatch lacked eighteen-months' worth of updates, gave Homecare and its counsel a reasonable belief that PlayMaker had misappropriated Harvest.

Perhaps Homecare is silent because its own evidence suggests that it is PlayMaker who should have been worried. In a March 27, 2012 e-mail, Tunnell instructed Brown to "rob whatever we can from any good product ideas they [PlayMaker] have so we can incorporate into our product ASAP." This instruction makes Homecare's contention that PlayMaker stole Homecare's trade secrets farcical.

### b. Accessing Harvest

Turning to Homecare's third factual basis for its trade-secrets claim—that PlayMaker wrongfully accessed and used Harvest through either HMS or a Homecare customer—this allegation also lacks evidentiary support. The matrix does state that PlayMaker was using HMS to purchase Medicare data, but the matrix is silent about a concern that PlayMaker was accessing Homecare's allegedly proprietary information in HMS's possession.[3]

In fact, the matrix explicitly concludes that there were "no intellectual property concerns." This conclusion directly under-

---

propriated. This further erodes Homecare's contention that it had a reasonable basis for bringing a trade-secrets claim against PlayMaker and further supports the Court's conclusion that Homecare's counsel violated Rule 11 by including the claim in the complaint.

**3.** The dubiousness of Homecare's claim that it had proprietary information with HMS is addressed above.

cuts Homecare's factual allegation that it believed PlayMaker was getting proprietary information from HMS. The conclusion also negates Homecare's contention that PlayMaker might have misappropriated Harvest through one of Homecare's customers. If there were no intellectual property concerns, Homecare had no reason to believe that PlayMaker had misappropriated trade-secrets information from either HMS or a Homecare customer.

Homecare fecklessly contends that because it did not have access to TargetWatch before it filed suit, it could not have reached a conclusion about whether TargetWatch misappropriated Harvest. However, the matrix does not qualify the intellectual property conclusion based on a lack of access to TargetWatch. Thus, Homecare's explanation falls far short of showing that during the pre-suit investigation of what claims were reasonable, Homecare and its counsel properly considered the matrix and its contradiction of Homecare's factual allegation that PlayMaker accessed Harvest through HMS or a Homecare customer.

### c. Other Evidence

Other documents in Homecare's possession cast further doubt on the truthfulness of its claim that it has not accessed TargetWatch and of the factual allegations in its complaint about PlayMaker's misappropriating Harvest. Well before the suit was filed, Tunnell, Brown and McDaniel sent e-mails discussing the need to steal PlayMaker's ideas and dismissing the press release about PlayMaker's teaming up with HMS for TargetWatch. For example, in one e-mail Tunnell dismisses TargetWatch and PlayMaker's partnership with HMS, stating that TargetWatch is "just reselling HMS," which will be "cost prohibitive" for PlayMaker; there is no

mention of PlayMaker stealing Harvest through HMS. Tunnell's cavalier attitude undermines Homecare's contention that it was concerned that PlayMaker and HMS worked together in light of the allegedly proprietary information Homecare had with HMS and HMS's access to Harvest.

Indeed, none of the Homecare e-mails filed with this motion raises a concern about PlayMaker's misappropriating Harvest. Rather, the evidence shows that Homecare was actually concerned with losing business. According to a March 27, 2012 e-mail sent by Tunnell, Homecare was "at a VERY critical stage as to growth and competition and we ABSOLUTELY MUST get this right and do a VERY thorough job." Consequently, Tunnell instructed Brown and other employees to "recon" PlayMaker's software, compare it to Homecare's, and "rob whatever we can from any good product ideas." Hardly the language of a company legitimately concerned that a competitor was stealing trade secrets.

The April 2012 matrix further confirms Homecare's true concern. It focuses solely on whether PlayMaker would threaten Homecare, and the synopsis does not mention intellectual property concerns as the motivation for the comparison. In fact, a prior draft of the matrix characterizes Homecare's pre-complaint access and research of PlayMaker's systems as "corporate espionage,"[4] which leaves no doubt as to how Homecare viewed the steps it took to compile the matrix. And lest the reader forget, the section comparing Harvest and TargetWatch concluded that there are "no intellectual property concerns" with TargetWatch. Ultimately, the matrix concludes that "[w]hile there are a few PlayMaker features that are worth taking note of, HomecareCRM remains the industry

4. In the final version of the matrix, this phrase was changed to "research."

front runner." Again, there is no mention about a misappropriation concern.

### 3. Opportunity for Discovery

Homecare's opposition brief does not address the fact that the pre-suit e-mails and matrix—evidence Homecare should have known about and considered before filing its complaint—do not voice any concern about PlayMaker's misappropriation of trade secrets or lend any credence to Homecare's alleged worry that PlayMaker had misappropriated Harvest. Homecare's silence means that it has failed to explain how the matrix and e-mails (1) did not render its trade-secrets claim objectively frivolous, and (2) made it reasonable for it and its counsel to believe that the trade-secrets factual contentions had evidentiary support.

Rather, Homecare argues that it should be allowed "vigorous discovery" to establish its trade-secrets claim, as it has presented adequate circumstantial evidence in support thereof, and that PlayMaker is thwarting its attempts to do this. This argument is unavailing. First, although Homecare raises this discovery issue in its opposition brief, Homecare's new counsel has not brought the issue to the Court's attention and asked the Court to compel PlayMaker to comply. Thus, this argument is dubious.

Second, Rule 11(b)(3) requires that factual contentions that "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery" be "specifically so identified." Homecare's complaint does not so identify the relevant factual allegations for the trade-secrets claim, making its attempt to shift blame to PlayMaker meritless. Furthermore, even if PlayMaker is withholding discovery, Homecare makes no attempt to explain how discovery would negate the overwhelming evidence in Homecare's possession that directly refutes its own factual allegations.

### 4. Conclusion

The matrix and the e-mails between Homecare employees negate two of the three factual bases for Homecare's trade-secrets claim, which leaves the similar timing of the software releases as the only "factual" allegation in support of Homecare's trade-secrets claim. This does not counter the overwhelming evidence against the viability of Homecare's trade-secrets claim.

Thus, by including the trade-secrets claim, Homecare showed a "deliberate indifference to obvious facts" rather than a reasonable belief that its evidence was "merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law." *Baker*, 158 F.3d at 524. As a result, the Court finds that Homecare's trade-secrets claim was objectively frivolous when the complaint was filed and that Homecare and its counsel should have been aware of this. Consequently, Homecare's counsel violated Rule 11 when it signed the complaint with a trade-secrets claim included therein. As the evidence showing the objective frivolousness of the claim was in Homecare's possession, sanctions are appropriate.

### B. Appropriate Sanctions Under Rule 11(c)

As stated above, "Rule 11's primary objective is to give a litigant pause to stop, think, and investigate more carefully before filing papers, thereby streamlining the administration and procedure of the federal courts." *Noe*, 188 F.R.D. at 515. Moreover, an attorney has a "continuing obligation to make inquiries"; consequently, sanctions may be imposed when an attorney or party continues "insisting upon a position after it is no longer tenable." *Battles v. City of Fort Myers*, 127 F.3d

1298, 1300 (11th Cir.1997) (quoting FED. R.CIV.P. 11 advisory committee's note).

■ The Court considers the following factors in determining an appropriate sanction: (1) whether Homecare's and its counsel's improper conduct was willful or negligent; (2) whether the conduct was part of a pattern or an isolated event; (3) whether the conduct infected the entire pleading, or only one particular count; (4) whether Homecare's counsel has engaged in similar conduct in other litigation; (5) whether the conduct was intended to injure; (6) what effect the conduct had on the litigation process in time or expense; (7) whether Homecare's counsel is trained in the law; (8) what amount, in light of financial resources, is needed to deter Homecare and its counsel from repetition in the same case; and (9) what amount is needed to deter similar activity by other litigants. *McDonald v. Emory Healthcare Eye Center*, 391 Fed.Appx. 851, 853 (11th Cir.2010) (quoting FED.R.CIV.P. 11 advisory committee's note).

The evidence shows that Homecare's actions were at the very least negligent, as it appears to have ignored evidence in its possession that directly contradicts the factual allegations made in support of its trade-secrets claim. Also, although current counsel, who are trained in the law, recently appeared in this case, they had a month to investigate Homecare's trade-secrets claim and PlayMaker's accusations before the motion for sanctions was filed. Their review of the evidence should have shown them that Homecare's own documents rendered its trade-secrets claim objectively frivolous, and that prior counsel and Homecare should have known this

when the action was filed. Thus, Homecare and its new counsel should have dismissed this claim, but they did not. At the very least their refusal to do so is negligent, and seems to have resulted from a desire to injure PlayMaker as a result of Homecare's concern that PlayMaker posed a competitive business threat.

Somewhat mitigating is the fact that the problem appears to be limited to the trade-secrets claim,[5] and PlayMaker has not presented evidence in its motion that Homecare and its counsel have behaved similarly in other litigation. Nonetheless, the problems with this single claim and Homecare's and its counsel's refusal to dismiss it have caused the Court and PlayMaker considerable time and resources. This waste of time and resources, combined with the damning evidence in Homecare's possession, shows that its trade-secrets claim was objectively frivolous, merits sanctions that will deter it and its counsel from continuing such behavior in this case and deter other litigants from behaving similarly.

■ "[T]he selection of the type of sanction to be imposed lies within the district court's sound exercise of discretion." *Donaldson*, 819 F.2d at 1557; *see also* FED.R.CIV.P. 11(c)(1) ("[T]he court may impose an appropriate sanction on any attorney [or] law firm ... that violated the rule or is responsible for the violation."). Sanctions may include, for example, nonmonetary directives, such as a reprimand or instruction to attend a legal education course, or an order to pay a fine to the court. FED.R.CIV.P. 11(c)(4). Guiding the Court's decision is Rule 11(c)(4)'s admonition that the sanctions "must be limited to what suffices to deter repetition of the

---

**5.** The content of Homecare's employees' e-mails does give the Court pause, though, as to whether Homecare ignored other evidence that refutes other claims. These e-mails suggest that there could be an issue with Home-

care's other claims given its employees' ferocious pursuit of PlayMaker's information in order to keep Homecare ahead of PlayMaker in the competitive game.

conduct or comparable conduct by others similarly situated."

 With this in mind, the Court will strike Homecare's claim for misappropriation of trade secrets and its supporting factual allegations. Also, the Court will require Homecare to reimburse PlayMaker for the fees and costs its counsel incurred in bringing this motion. The Court will not impose a monetary fine payable to the Court, though, as the Court finds that striking the claim and requiring Homecare to pay fees are a sufficient deterrent from similar behavior in the future.

## IV. Conclusion

PlayMaker's motion for sanctions [113] is GRANTED. Homecare's claim for misappropriation of trade secrets and the attendant factual allegations are hereby STRICKEN. On or before July 19,

Homecare shall file an amended complaint with these paragraphs removed.

Further, Homecare must reimburse PlayMaker for its reasonable expenses and fees incurred in filing the motion for sanctions.[6]Homecare, PlayMaker and their counsel are DIRECTED to resolve this issue without the Court's involvement and preferably during the mediation.

Finally, the Court ORDERS all parties to mediation with a magistrate judge. The case is STAYED pending the parties' participation in mediation.

IT IS SO ORDERED.

---

**6.** This reimbursement is limited to the fees and costs associated with the motion for sanctions; PlayMaker cannot seek reimbursement for any costs or fees it incurred in connection with the motions to seal that it filed related to its motion for sanctions.